IN THE MATTER OF THE ESTATE OF CAROLINE
A. KELLEY, Deceased, WILLIAM E. WOER-
HEIDE, Curator of the Estate of ROSALIE AN-
SPACH, Respondent, v. JOSEPH M. KELLEY,
Administrator of the Estate of CAROLINE A.
KELLEY, Deceased, Appellant, JAMES P. NEW-
ELL, Administrator *de bonis non* of the Estate of
CAROLINE A. KELLEY, Deceased, Substituted
Appellant.

**St. Louis Court of Appeals. Opinion Filed November 6, 1923.**

1. **TRUSTS AND TRUSTEES: Curator and Ward: Wife Curatrix of Insane Person: Ward's Securities Converted: Knowledge of Husband: Both Accountable as Joint and Several Trustees.** Where the husband of a curatrix of an insane person knew that securities given him by his wife and by him sold and the proceeds thereof afterwards used by him and his wife in speculation and margin trades, were the property of the ward, such constituted a breach of trust of which the husband was cognizant, and both, then, became accountable as joint and several trustees.

2. ———: ———: ———: ———: **Securities Substituted by Curatrix for Ward's Securities Converted: Evidence: Sufficiency.** On petition by the curator of an insane person against the administrator husband of a deceased prior curatrix of such insane person, praying that certain property belonging to the insane person be turned over to him, evidence *held* to establish that the deceased curatrix, who, in conjunction with her husband, had sold securities which were the property of the ward and converted the proceeds, had substituted the securities sought to be recovered for the securities converted by them.

3. ———: ———: ———: ———: ———: **Presumption.** In a proceeding by a curator of an insane person to recover securities from the administrator husband of a former curatrix who together with her husband had converted and sold the insane person's securities, it being impossible to separate the moieties of the fund and determine with whose money the securities were bought, it will be presumed that the price was paid with the money of the ward.

4. ——: ——: ——: ——: ——: **Trustee Investing Trust Funds in Own Name: Cannot Charge Trust Estate With Loss.** Where a trust fund was used by the trustee as his own, and all investments were made by him in his own name, such trustee cannot charge the trust with the losses he has sustained.

5. ——: ——: ——: ——: ——: **Express Trust Created.** Where the curatrix of an insane person gave securities belonging to such insane person to her husband, which securities were by him sold and the proceeds thereof used in the purchase of other securities, *held* under the facts in evidence there was a creation of an express trust on the part of the curatrix and her husband in the substitution of the securities purchased for the converted funds.

6. ——: **Evidence: Express Trusts in Personal Property: May be Shown by Parol.** An express trust in personal property may be shown by parol testimony.

7. **EVIDENCE: Husband Sued as Wife's Administrator: Declarations and Admissions: Admissibility.** Where the curatrix of an insane person gave securities belonging to her ward to her husband, which were by him sold and the funds used in the purchase of other securities, and the husband on the death of the curatrix was named as her administrator, his declarations and admissions were admissible in a proceeding by a successor curator of such insane person to recover securities substituted for those converted.

8. **APPELLATE PRACTICE: Facts Admitted by Appellant Accepted as True.** Facts admitted in appellant's written statement, brief and argument will be accepted as true by the appellate court.

9. ——: ——: **Evidence: Erroneously Admitted: Not Prejudicial in View of Appellant's Statement, etc.** An admission of evidence, if erroneous, was not prejudicial where the truth of the facts was admitted in appellant's written statement, brief and argument, and there was other competent testimony as to the same facts.

## Appeal from the Circuit Court of the City of St. Louis.
### —*Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*Randolph Laughlin* for Joseph M. Kelley, appellant.

*Peter T. Barrett* for James P. Newell, substituted appellant.

(1)    The curatrix of Rosalie Anspach permitted securities belonging to her ward to be sold by Joseph M. Kelley, and the proceeds to be deposited to his credit with Edwards & Company, and used by him as his own funds. This created the relation of debtor and creditor between Kelley and the curatrix, and not that of trustee and *cestui que trust*. Nor did the fact that Kelley knew that the securities were so deposited by the curatrix as trustee for her ward, operate to clothe him with any trust. Paul v. Draper, 158 Mo. 197; Bircher v. Walther, 163 Mo. 461; Pearson v. Haydel, 90 Mo. App. 253; Raymuth R. E. & Bldg. Co. v. Robinson, 199 Mo. App. 515, 204 S. W. 276; Beck v. Krembs, 201 Mo. App. 697, 213 S. W. 487. (2)    Independent of the above proposition, and even if we assume that Kelley stood as a trustee for the ward instead of as a debtor to the curatrix. Kelley's violation of the rule which forbids the employment of a ward's funds in trade or speculation, or the use of them in the trustee's own business, merely gave the ward the right of election— (a) To hold the curatrix liable for principal and interest, to the utmost value of the securities deposited with Kelley; or— (b)    To follow the converted securities as a trust fund and claim all profits arising from their use. Sequin's Appeal, 103 Pa. St. 139; Thompson v. Hartling, 125 Ala. 263; Johnston v. Janes, 48 Ga. 554; Robinson v. Robinson, 22 Iowa, 427; Tealey v. Hoyte, 3 Tenn. Ch. 561; Ingenhuett v. Hunt, 15 Tex. Civ. App. 248; 28 C. J. 1155, note 36; 1156, note 43 and citations. But the ward must elect either, and not both. She cannot claim both profits and interest. Kyle v. Barnett, 17 Ala. 306, 312; Woerner on Guardianship, p. 208; 28 C. J. 1156, note 44. And when the ward elects to take profits, she must submit to the losses also. Estate of Small, 144 Pa. St. 293; Woerner on Guardianship, p. 208; 28 C. J. 1156, note 46. Where, as in this case, the ward is insane, the court may make the election for her. And the order of October 15, 1918, was such an

election, viz.: An election to take principal and interest to the full value of the converted property. Kennedy v. Johnston, 65 Pa. St. 451; Sequin's Appeal, 103 Pa. St. 139; 28 C. J. 1156, note 45. Independent of the election made by the court, the curator Woerheide had and exercised the right to elect for his ward, and made the same election theretofore made by the court, viz.: The election to take the full value of the converted securities, with interest. Such election was evidenced by the receipt of October 16, 1918. Woerner on Guardianship, p. 453, and citations. An election to follow the fund would have been ruinous to the ward, in that the Edwards account shows that Kelley's speculations with that firm caused the loss of more than $18,000, less than one-third of which was the ward's money, and more than two-thirds of which was his own. (3) The curator in this case seeks to do indirectly that which he cannot do directly, viz.: Make a double election, and claim both interest and profits. Nor would he stop with this. He would go further, and escape all losses. And he would accomplish this by the device of claiming that during the lifetime of the curatrix, Mrs. Kelley, title to the disputed securities passed from her to the ward. As to the National Enameling stock: It is conceded that the same was purchased by Kelley, and the title taken in the name of his wife (the curatrix) before Kelley ever received or sold the securities of the ward. But it is claimed that thereafter Mrs. Kelley made declarations in the presence of the Woerheides that she had bought such stock for her ward. Such declarations, if competent, will not and cannot create a trust. They are without force or effect, either in law or equity. Kisler v. Kisler, 2 Watts (Pa.) 323; 12 R. C. L., p. 1171. It is further claimed that the National Enameling stock was bought on credit; that the subsequent deposit of the ward's money to the account operated to pay for the stock, and thus created a resulting trust in favor of the ward. To this we reply: (a) A resulting trust can arise

only where the purchase of the property, the taking of the title, and the payment therefor with the money or property of another, are all at one and the same time. A trust does not and cannot arise from the fact that the curatrix or trustee who bought the property on his own credit subsequently paid for it with the funds of the ward. French v. Sheplor, 83 Ind. 266; Tilford v. Torrey, 53 Ala. 120; Lehman v. Lewis, 62 Ala. 129; Rogers v. Murray, 3 Paige, 390; 28 C. J. 1155, note 38. (b) As a matter of fact, this stock was paid for in full before Kelley ever received the ward's funds or securities. Lastly, it is claimed that title to the National Enameling stock passed to the ward when the curatrix put it in a large linen envelope having the name "Rosalie Anspach" written upon the cover, deposited the same in the safe deposit box, and thereby evidenced her intention to appropriate it to the use of the ward, in place of the ward's moneys which had been lost in Kelley's speculations. To this we reply: Neither an oral agreement on the part of the curatrix to turn over the stock, nor a bona-fide intention on her part to surrender it, nor proclamation by her that such intention existed, or that it had been consummated, nor any other act or thing short of an endorsement upon the stock certificate itself, could operate to divest the title to such stock out of the record owner, or to constitute either a tender by such owner, or an acceptance on the part of Rosalie Anspach. Baltimore Fire Brick Co. v. Mali, 65 Md. 93; Allen-West Commission Co. v. Grumbles, 129 Fed. (8 C. C. A.) 289; 53 C. C. A. 401; Gray v. Doubikin, 188 Mo. App. 567; Foley v. Harrison, 233 Mo. 538; In re Estate of Soulard, 141 Mo. 642; Harris Banking Co. v. Miller, 190 Mo. 662; Gartside v. Pahlman, 45 Mo. App. 164. All that has been said with reference to the National Enameling stock applies with equal force to the Distillers bond. The 1916, it was physically delivered to him by Edwards & Edwards account shows that it was purchased by Kelley on February 4, 1916, for $748.75; that on March 3,

Co., and that he did not sell the ward's securities (the Western Maryland bonds) until March 8th.  Moreover, this bond was always claimed by Kelley as his personal property, and never was in the envelope marked "Rosalie Anspach."  The fifty shares of Westinghouse stock were bought by Kelley on July 13, 1916—more than four months after converting the securities of the ward. As to these shares, it is clear that if Kelley is to be treated as a trustee for the ward, then the ward has the right to follow the fund, and to claim all the profits. But before she can make such election, she must rescind her prior election, and restore the property and interest evidenced by the receipt of October 16, 1918. By electing to claim the profits, she will adopt Kelley's speculations as her own.  She will thereby become bound to bear her proportion of the losses in her chosen business.  Having contributed approximately one-third of the capital, she will be liable for only one-third of the $18,000 loss; as against which she will be entitled to one-third of the "profits" (the flotsam and jetsam), evidenced by the one Distillers bond and the fifty shares of Westinghouse stock.  Small's Estate, 144 Pa. St. 293; Woerner on Guardianship, p. 208; 28 C. J. 1156, note 46. (4)  Independent of the above propositions, and each of them:  Absent the so-called declarations against interest, made in the deposition and transcripts of J. M. Kelley, plaintiff's case is unproved in its entire scope. But neither as an individual nor as an administrator could Kelley bind the estate by declarations or admissions.  Both his deposition and his transcripts should have been excluded.  McClay v. Norris, 9 Ill. 370; Enos v. Capps, 12 Ill. 255; Bennett v. Bradford, 132 Ill. 269.

*W. W. Henderson* for respondent.

DAVIS, C.—On appeal here from the circuit court of the city of St. Louis, on appeal there from the probate court.  Judgment in the circuit court sustaining a motion of the curator surcharging a settlement made by

the administrator of Caroline A. Kelley, deceased, former guardian of her sister Rosalie Anspach, *non compos*, and directing him to turn over certain securities and money to the subsequent and domiciliary curator, William E. Woerheide.

Upon the death of Caroline A. Kelley, Joseph M. Kelley, her widower, under appointment from the probate court, took charge of her estate. In due course the administrator filed his first inventory, and, under the heading "PROPERTY CLAIMED FOR ROSALIE ANSPACH," he inventoried 100 shares of the Common Stock of the National Enameling & Stamping Company, par value of $100 per share. The certificate was issued to Caroline A. Kelley, and was not endorsed. He also inventoried one Liberty bond for $1,000 registered in the name of Caroline A. Kelley, guardian for Rosalie Anspach, and one bond of the Helena Gas & Electric Company for $1,000.

Thereafter curator Woerheide filed a petition in the probate court praying that certain property be turned over to him, and on October 15, 1918, the parties appeared in court, and by consent the probate court ordered the National Enameling & Stamping Company stock, the Liberty bond, and the Helena Gas & Electric Company bond turned over to the curator as the property of the ward Rosalie Anspach, without prejudice to either of said parties, as to the title to the remaining stock and bonds described in the petition of said curator, theretofore filed. The receipt given the administrator, by curator Woerheide, for the above stock and bonds, omitting caption and signatures, is as follows:

"St. Louis, Mo., October 16, 1918.

"Received of Joseph M. Kelley, Administrator of Caroline A. Kelley, the following property of Rosalie Anspach, this day surrendered and turned over by him in obedience to the order of the Probate Court and entered in the above entitled cause on October 15, 1918, viz.:

| | |
|---|---:|
| 100 shares National Enameling & Stamping Co., common stock of the par value of $100, but of the present market value of about $52 | $5,200.00 |
| Dividend declared Aug. 10th, $1.50 per share | 150.00 |
| One $1,000 registered 3½ per cent Liberty Bond | 1,000.00 |
| June interest on same | 17.50 |
| One $1,000 Helena Gas & Electric Co. first six per cent mortgage bond, including interest due April 1, 1918 | 1,000.00 |
| Total | $7,367.50 |

"And the said estate of Caroline A. Kelley, deceased, and the said Joseph M. Kelley, as administrator thereof, and also in his individual capacity, are now hereby released and discharged of all and all manner of liability on account of said securities and dividends, or any of them, and on account of the possession, custody and retention thereof.

"It is understood, however, that this receipt is without prejudice to the rights of any parties hereto in any matter connected with any securities not hereinabove listed.

"IN WITNESS WHEREOF we have hereunto affixed our signatures the day and year first above written.

"(Signed) WILLIAM E. WOERHEIDE,
Curator of the Estate of
ROSALIE ANSPACH,
Non Compos."

Thereafter on October 13, 1919, the curator filed an amended petition surcharging the settlement filed by the administrator of Caroline A. Kelley, and praying that a correct balance be ascertained and that the administrator be ordered to turn over and deliver to the curator any securities now held by him as administrator of the estate of Caroline A. Kelley belonging to said Rosalie Anspach.

Upon a trial *de novo* in the circuit court, the court found that Joseph M. Kelley, administrator of Caroline A. Kelley, had in his possession the following securities belonging to the estate of Rosalie Anspach and which Caroline A. Kelley as guardian of Rosalie Anspach, *non compos,* had in her possession at the time of her death, to-wit: 50 shares of Westinghouse Electric & Mfg. Company Common Stock, and one bond of Distillers Securities Corporation of the denomination of $1,000, which the administrator, together with $465.55 as dividends on said stock and interest on said bond to December 1, 1920, was ordered to turn over and deliver to curator Woerheide for his ward.

The cause was tried upon the testimony offered and introduced by curator Woerheide. The testimony tends to show that on March 8, 1916, Caroline A. Kelley, Pennsylvania guardian of Rosalie Anspach, through her husband Joseph M. Kelley, sold seven Western Maryland bonds for $5154.14; that on January 17, 1916, and February 24, 1916, there were sold four and eight shares of New England Power Company stock for $136.92 and and $482.39, respectively, all the property of Rosalie Anspach, and which was, with Mrs. Kelley's consent, credited to the personal account of Kelley. This was a speculative account covering the year 1916, during which time Kelley was engaged in gambling transactions and margin trades in divers and sundry securities. He also made a few legitimate trades, among others, buying on January 13, 1916, for $2662.50 cash, 100 shares of the National Enameling & Stamping Company stock. On February 4, 1916, he bought for $748.75 cash a Distillers bond. On July 13, 1916, fifty shares of Westinghouse stock, paid for out of the mingled fund that he had with A. G. Edwards & Sons. Kelley in his speculations in the securities lost the money in the account, including Rosalie Anspach's money, and $12,000 of his own.

At the time of Mrs. Kelley's death, the National Enameling stock, the Liberty bond, and the Helena Gas

and Electric bond were in the joint box of Mr. and Mrs. Kelley in the Mississippi Valley Trust Company, in an envelope in her handwriting marked "Rosalie Anspach," and which were afterwards inventoried by Kelley as Rosalie Anspach's property. Kelley first saw the envelope in the fall of 1915. It was the same envelope in which the Western Maryland bonds were sent from Philadelphia. The National Enameling Company stock was purchased for $2662.50 on January 13, 1916, by Kelley, listed in the name of Caroline A. Kelley, and placed in the safe deposit box, held in their joint and several names and control. Joseph M. Kelley and Caroline A. Kelley were husband and wife. They kept a joint bank account, were fifty-fifty partners, and conducted jointly the speculative account with A. G. Edwards & Sons, in the name of Joseph M. Kelley, the account in which the proceeds of the sale of the securities of Rosalie Anspach were deposited, and which proceeds were used in their speculations. Speaking of the National Enameling stock, in one of his examinations, Kelley testified: "The title, you might say, changed back here in December, 1917. She (Rosalie Anspach) was merely getting the income. You must understand we simply gave her income off these securities. In other words, I took all her (Rosalie Anspach's) money, used it as I saw fit, and gave her so much income." Again, "We never gave her that stock (National Enameling) until the stock became a six per cent dividend payer." The first dividend, $200, on this stock was paid by check May 15, 1917, to Caroline A. Kelley, deposited to her credit, and shortly afterwards $75 was sent to Rosalie Anspach's account in Philadelphia. November 15, 1917, a dividend check of National Enameling for $200 to Caroline A. Kelley bore this endorsement: "Caroline A. Kelley for deposit only to the account of Caroline A. Kelley, Guardian Rosalie Anspach," etc. On March 20, 1918, check payable to Caroline A. Kelley, for $150, endorsed and deposited to her credit. On May 31, 1918,

check to Caroline A. Kelley for $150, endorsed Caroline A. Kelley, Joseph M. Kelley, in his handwriting, Charles Schlem, deposited July 6, 1918. There was also evidence to show that a dividend of $200 was paid October 11, 1917. Mrs. Kelley died June 27, 1918. Kelley testified: "In April or May, 1918, two months before Mrs. Kelley died, was the first time we agreed that the National Enameling stock was the property of Rosalie Anspach." When the stock first began to pay dividends, it was worth $27 a share. At the time it was turned over $52 a share. Relative to the proceeds received from the sale of the Western Maryland bonds and the stock belonging to Rosalie Anspach, aggregating $5773.45, this money was used by Kelley in his speculations, and his contention is to the effect, that they (Mr. and Mrs. Kelley) did not buy or invest the money for the ward, but merely gave her an interest in any securities they had, and she (Rosalie Anspach) got a proportional amount of the profits. They had in their box $12,000 or $13,000 worth of securities. Mrs. Kelley said: "I want to be sure that Rosalie has a good income." Kelley testified the market conditions were so very precarious and he said, "We can't make any investment, we will just give her a certain income."

The Westinghouse stock (bought July 13, 1916 for $2725 with funds from the account in which the ward's money had been mingled), and the Distillers bond, were put by Kelley in the safe deposit box jointly used by Kelley and his wife, but they were never put in the envelope marked "Rosalie Anspach." Kelley testified: "These fifty shares of Westinghouse and this Distillers Security were not in this envelope I speak of. At times we gave her some dividends, so that she was always having income." The Distillers bond was inventoried. The coupon off of that bond, found in the box and inventoried, was sent by Mrs. Kelley and credited to Miss Anspach, and dividends on Distillers bond were turned over to her by Mrs. Kelley.

Mrs. Anna W. Woerheide, sister of Mrs. Kelley, testified that Mrs. Kelley told her in 1916 that Rosalie's securities were in Distillers bonds and Westinghouse stock. That in the spring of 1917, she told her that Mr. Kelley persuaded her to put Rosalie's money in National Enameling, but she hoped it would be merely temporary, and always hoped to put it in a permanent legal investment. She repeated that over and over again, both in Mr. Kelley's presence and when they were alone. Again, in a letter dated November 24, 1916, from Mrs. Kelley to her sister Clara Woffington, it was stated that her (Rosalie's) money was then in Westinghouse and Distillers.

E. E. Woerheide, husband of Mrs. Anna W. Woerheide, testified that Mrs. Kelley in April or May, 1917, stated that the ward's money was invested in Westinghouse stock, Distillers bond, and National Enameling stock.

Kelley further testified: "I told you what actually occurred. I am telling you Mrs. Kelley turned around and said, 'Rosalie has got $5,040 and giving her this National Enameling stock, which is paying six per cent dividend, gives her much better income than she ever got."

Joseph M. Kelley further testified that the National Enameling and Stamping Company's certificate of stock was made out in the name of Caroline A. Kelley, and the reason she never changed same was for convenience sake. Testimony further shows that Mrs. Kelley owned one-half interest in the Helena Gas and Electric bond of $1,000 and that the ward owned the other one-half, and that Mrs. Kelley after selling the New England Power Company bond from which she realized a total of $619.31 gave to the ward the other half of her personal interest in said Helena Gas and Electric Company bond.

I. The first assignment of error relates to the trial court's failure to give defendant's demurrer to the evidence.

Administrator Kelley inventoried the National Enameling stock, the Liberty bond, and the Helena G. & E. bond, as the property of Rosalie Anspach, hereinafter called the ward. But as the Liberty bond was purchased with funds received from Philadelphia and not from the proceeds of the securities converted by Mr. and Mrs. Kelley, and as Mrs. Kelley gave Rosalie Anspach her (Mrs. Kelley's) one-half interest in the Helena G. & E. bond, we eliminate them from this discussion.

Plaintiff's amended pleading surcharges the settlement of Mrs. Kelley's administrator, claiming fifty shares of Westinghouse stock and a Distillers bond, together with converted dividends and interest, as the property of the ward.

It is contended by defendant that, with respect to the ward's converted securities there arose the relation of debtor and creditor between Mrs. Kelley, as curatrix, and Kelley, and not that of trustee and *cestui que trust*. It seems to be conceded that Kelley knew that the securities, given him by Mrs. Kelley and by him sold, and proceeds thereof afterwards used by him and Mrs. Kelley in speculation and margin trades, were the property of the ward. This constituted a breach of trust, of which Kelley was cognizant. Both, then, became accountable as joint and several trustees. [Leach v. Gray (Ala.), 77 So. 341; 7 A. L. R. 890; Jeffray v. Towar, 63 N. J. Eq. 530, l. c. 538.]

But says the defendant, this merely gave the ward the right of election—(a) to hold the curatrix liable for principal and interest to the utmost value of the securities deposited with Kelley; or (b) to follow the converted securities as a trust fund and claim all the profits arising from their use. We do not so construe the evidence, but think a very different situation is presented. Between January 17, and March 8, 1916, Mr. and Mrs. Kelley sold securities of the ward for sums aggregating $5773.45, converting the proceeds to their own use. Mrs. Kelley, then, with the consent of Mr. Kelley, desiring

to protect her sister, the insane ward, as we think the evidence shows, substituted for the converted fund, the National Enameling stock, the Distillers bond and the Westinghouse stock, purchased for $2662.50, $748.75, and $2725, respectively. To state it otherwise, the above stocks and bond became estate capital. While Kelley seemed to insist, in places, in his examinations, that the stocks and bond were placed in the joint safe deposit box, held in the name of himself and Mrs. Kelley, merely as security, we do not think this is borne out by the evidence. It is undisputed, that, as administrator, he inventoried the National Enameling stock as the property of ward. He unequivocally states that Mrs. Kelley gave the stock to the ward in May, 1918. In one of his examinations Kelley testified that the title to this stock changed back here in December, 1917. Another time he testified: "We never gave her that stock until it became a six per cent dividend payer." Again he stated, "I am telling you Mrs. Kelley turned around and said, 'Rosalie has got $5040 and giving her this National Enameling stock, which is paying a six per cent dividend, gives her a much better income than she ever got.' " The evidence further shows that Mrs. Kelley received a dividend check from the National Enameling Company for $200, dated May 15, 1917, which was deposited to her account, $75 of which she forwarded to Philadelphia and credited to the ward's account. On November 15, 1917, she received another dividend check for $200, which check she sent to Philadelphia to the credit of her ward. Again, Kelley stated that he saw this envelope marked "Rosalie Anspach" and in which Mrs. Kelley placed the National Enameling stock sometime in 1915, but did not know when the words "Rosalie Anspach" were written thereon. Considering the evidence, we think it sufficient upon which to base a finding that the National Enameling stock was substituted in part, about March 8, 1916, for the securities converted by Mr. and Mrs. Kelley.

As the National Enameling stock was purchased for $2662.50, Mrs. Kelley is to be credited with that sum on the amount converted. This left a balance due the ward, and in lieu of that balance plaintiff claims the Westinghouse stock and the Distillers bond were substituted, the aggregate purchase price of which slightly more than equaled the balance due the ward. The record shows the Distillers bond was inventoried, and we may assume as the property of Mrs. Kelley. The declarations of Mrs. Kelley, repeatedly made in the presence of Kelley, together with the writing, to the effect that Rosalie's money was then in Westinghouse and Distillers, are sufficient to demonstrate that she substituted the securities with Mr. Kelley's consent in lieu of the money converted by them.

It is conceded that the Westinghouse stock was purchased with the mingled funds of Mr. and Mrs. Kelley and the ward. As it is impossible to separate the moieties of the fund and determine with whose money the stock was bought, it will be presumed that the price was paid with the money of the ward. Appellant contends, however, that inasmuch as Mr. and Mrs. Kelley lost $18,000 in their speculative account, with which the funds of the ward were mingled, in electing to take the profits, the ward must also be subjected to the losses. We do not regard the evidence as showing the ward interested in the speculative account. She is merely following trust funds. The evidence goes no further than demonstrating that Mr. and Mrs. Kelley converted funds of the ward to their own use, and, in lieu thereof, substituted and turned over to her certain other property. However, considering the facts, we do not hold to the rule that the ward is subject to losses. We prefer the rule to the effect that where the trust fund was always used by the trustee as his own, and all investments were made by him in his own name, such trustee cannot charge the trust with the losses he has sustained. [Mitchell v. Moore, 95 U. S. 587; 24 L. Ed. 492.]

In discussing the questions involved, defendant contends, that as the National Enameling stock was listed in Mrs. Kelley's name and never assigned in writing to Rosalie Anspach, that the title failed to pass until the stock was delivered to curator Woerheide in accordance with the probate court order. To this contention we do not assent, but think the result reached by us falls within the rule enunciated in Harris Banking Company v. Miller, 190 Mo. 640, 89 S. W. 629. In that case the court held that, where a donor deposited money in a bank and took a certificate of deposit and assigned that certificate to his housekeeper and stated he wanted her to have the money and asked the president of the bank to keep it, and on his refusal took it to his home, showed it to her, and said, "Now this is yours, but I want to use it while I live," and placed it in his pocketbook and put the book in his shirt and had it sewed in, and it was there at his death, his only purpose seeming to be to draw the interest on it while he lived, the principal to be hers after his death, there was no such delivery as constitutes a gift *inter vivos*. Nevertheless, her right to the *corpus* of the gift may be enforced as an express trust, since at the time he deposited the money in the bank he said it belonged to her, and directed the bank to pay it to her alone. So in this case, under the facts in evidence, there was an abundance of proof to show the creation of an express trust on the part of Mr. and Mrs. Kelley, in the substitution of the National Enameling stock, the Distillers bond and the Westinghouse stock, for the converted funds. Such a trust, in personal property, may be shown by parol testimony. [Harris Banking Company v. Miller, 190 Mo. 640; Orr v. St. Louis Union Trust Company, 291 Mo. 383, l. c. 403, 236 S. W. 642; Northrip v. Burge, 255 Mo. 641, 164 S. W. 584.] While the facts in the Harris Banking case concede that the certificate of deposit was endorsed to the beneficiary, yet we think this case falls within the broad rule found on page 664, to-wit: "When a person orally or in writ-

ing explicitly or impliedly declares that he holds personal property for another, he thereby constitutes himself an express trustee.'' We have no hesitancy in reaching our conclusion, as the securities substituted were based on a valuable consideration, that of converted funds.

II.   Defendant again assigns as error the admission of the deposition and transcript of the prior examinations of Kelley in the probate court, contending that, neither as an individual nor as administrator, could he bind the estate by declarations or admissions.

Adair v. Railroad, 282 Mo. 133, 220 S. W. 920, lays down the general rule that identity of interest, joint enterprise or conspiracy renders the declarations or admissions competent.   In Armstrong v. Farrar, 8 Mo. 628, declarations of a party to the record, appearing to show the mental capacity of the deceased at the time of making his will, made after the death of the testator, were held competent against all the defendants since they were not only parties to the record, but identical in interest.   The reasoning in this case was held good in the Adair case.

Kelley was the administrator and distributee of the estate.   Moreover, he is claiming the Distillers bond as his own.   In the capacity of administrator he represented, in this suit, the deceased and the other distributees. While the other distributees may have been proper, they were not necessary parties and a judgment against the decedent's estate binds them.   They were, however, represented by the administrator.   The interest of all the distributees, so far as the claim against the estate goes, were identical, even though not made actual parties. The declarations and admissions, embracing the relation of facts by a participant in a breach of trust, were contained within the written deposition and transcript of the examination of Kelley, concerning which the right of cross-examination obtained.

Again, counsel for defendant stated in oral argu-

ment that there was no doubt but that Mrs. Kelley permitted Kelley to use the funds of the ward as his own, and that Kelley knew the funds were those of the ward. We think these facts are admitted in appellant's written statement, brief and argument. We then feel legally justified .in accepting the statements as true. [Pate v. Dumbauld, 250 S. W. 49; State v. Ray, 225 S. W. 969.] Other evidence, than Kelley's, tends to show that the ward's securities were sold and that her money was in Westinghouse stock, Distillers bond and National Enameling stock.˙ A. Woerheide testified regarding what Mrs. Kelley said to him: "She told of bringing the Western Maryland bonds to St. Louis at Mr. Kelley's suggestion. Those bonds were brought out here in October of 1915 and held here waiting a favorable opportunity to sell. The bonds were sold early in 1916. . . . Q. Just state her conversation. A. .Well, after the sale of these securities she stated that the money of the ward was invested in Westinghouse stock, Distillers bond and National Enameling stock. Q. Did she at any time mention all three of these securities? A. Yes; in the spring of 1917 she mentioned all three at the same time. Q. Do you know what month in 1917? A. If I recall correctly it was in May, early in May or end of April."

In addition, Mrs. Kelley in a letter admitted that the ward's money was in Westinghouse and Distillers. Under these circumstances the admission of Kelley's deposition and examinations was not prejudicial.

III. What we have heretofore said disposes of the assignment of error relating to the court's refusal to give defendant's declarations of law I, II, III, IV, V, VI and VII. Also to the court's giving one of its own motion, a modification of defendant's No. I declaration of law. It also disposes of the other assignments of error.

The Commissioner recommends that the judgment be affirmed.

PER CURIAM:—The foregoing opinion of DAVIS, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed.

*Allen, P. J., Becker* and *Daues, JJ.,* concur.