256 S.W.2d 277 (1953)
SCHOEN
v.
LANGE.
No. 28518.
St. Louis Court of Appeals. Missouri.
March 17, 1953.
*278 J. Grant Frye, Cape Girardeau, for appellant.
A. M. Spradling, Jr. and Strom & Spradling, Cape Girardeau, for respondent.
BENNICK, Presiding Judge.
This is an action originating in the Circuit Court of Cape Girardeau County between Frieda A. Schoen, guardian and curatrix of her husband, Theodore A. G. Schoen, non compos mentis, as plaintiff, and Ella M. Lange as defendant.
The action grows out of a controversy which arose between the parties over the distribution of certain property upon the death on November 23, 1947, of Theodore's father, Dr. E. R. Schoen, a resident of Jackson, Missouri.
Dr. Schoen left surviving him two children, a married daughter, Flora Schoen Krueger, and the son, Theodore, who had been adjudged incompetent in 1941.
Defendant, Ella M. Lange, was no relation to the deceased, but had been employed in his office, and after the death of his wife in 1946, and especially after his health began to fail, had lived in his home and had cared for him as his nurse. He had been blind to all intents and purposes; and he had relied upon Ella to look after his business affairs including the making of bank deposits and the drawing of checks. She drove his automobile for him; and so close had been the relationship between them that one witness described it as that of father and foster daughter. At the time of the trial she was employed in Cape Girardeau for two days a week in the home of Dr. W. A. Schoen, a brother of the deceased, and for five days a week at the local osteopathic hospital where she was the nurse in charge of one of the floors.
The deceased had carried a policy of life insurance for the face amount of $5,000, and some seven months after the death of his wife he had arranged with the insurance company for the designation of Ella as beneficiary. The only explanation which the record affords is that the deceased, having become financially unable to continue payment of the premiums, had contemplated turning in the policy for its cash surrender value of $500, whereupon Ella, learning of his predicament, had paid him the sum of $500 and had assumed liability for the further payment of the premiums in consideration of his designation of her as beneficiary. Subsequently she and the deceased joined in assigning the policy to a bank in St. Joseph, Missouri, as security for a loan to the deceased of $2,500; and upon the death of the deceased, after satisfaction of the debt secured by the policy, she was paid the sum of $2,585.65 as her share of the aggregate proceeds of the policy. In addition the bank itself paid her the sum of $2.88 representing unearned interest on the loan.
The deceased left a will which was admitted to probate on December 1, 1947.
Under the terms of the will, after specific bequests of $25 to St. Paul Lutheran Church in Jackson and of the deceased's automobile to Ella, it was provided that all the rest, residue, and remainder of the estate should be divided one-third to the deceased's daughter, Flora; one-third to his son, Theodore; and one-third to Ella. However, as for the bequest to Theodore, there was a limitation that Theodore should receive $25 in cash, and that so much of the balance of his one-third part as might be required should be applied in satisfaction of a note for $2,000, payable to one Minnie Northdurft, upon which note the deceased was a co-maker. Apparently Theodore was also a co-maker, but nothing is shown regarding the identity of Minnie Northdurft or the circumstances surrounding the execution of the note.
Displeased with the turn of events whereby it appeared that Theodore, who had been declared incompetent, would actually receive but little from his father's estate while Ella, who was no relation, would profit most from the deceased's bounty, both Flora and Frieda, shortly after the admission of the *279 will to probate, consulted an attorney, Honorable J. Grant Frye of Cape Girardeau, whom Frieda thereupon employed to institute legal proceedings to contest the will upon the ground of Ella's alleged undue influence upon the deceased; to have the designation of Ella as beneficiary of the life insurance policy avoided upon the same ground; and to cancel the Minnie Northdurft note upon the ground that Theodore had been of unsound mind at the time of his execution of the note. It is to be kept in mind that Frieda was not only Theodore's wife but also his guardian and curatrix, and that her employment of counsel for the purposes indicated was in the latter capacity.
No legal proceeding was meanwhile instituted, and in August, 1948, Flora conceived the idea that before the jurisdiction of the courts was invoked, the matter in dispute should be brought before the local Lutheran congregation at Jackson, which her father had remembered in his will, and of which Ella was a member. While Flora herself was not a member of the local congregation, she was none the less a Lutheran, and was in fact the wife of a minister of that faith who was stationed in Memphis, Tennessee. Frieda was apparently not a member at the time in question, but later became one. Theodore at one time had likewise been a member of the church.
In concluding that the matter should be brought before the local church authorities, Flora was acting in conformity with what is said to be the doctrine and practice of the Lutheran church, that before any of its members take a controversy between themselves to court, they should first attempt to have the controversy settled within the church.
In due time Flora and Frieda called upon Reverend W. Keisker, the pastor of the Jackson congregation, who agreed to bring the matter before the church, and then appointed a committee to hear the matter consisting of himself, L. W. Kasten, the chairman of the congregation, and one Bruening, whose official position, if any, is not disclosed. A series of hearings were thereupon held by the committee at which Flora and Frieda were present as complainants and Ella was present in her own defense.
In the course of such hearings Frieda informed the committee, with Flora's acquiescence, that the deceased's brother, Dr. W. A. Schoen of Cape Girardeau, had previously expressed the opinion to both her and Flora that all the propertythe insurance, the automobile, and the residue of the estateshould be divided equally between Flora, Theodore, and Ella. The committee was admittedly influenced by what purported to be Dr. W. A. Schoen's opinion, and it rendered its decision accordingly save only that when Ella broke into tears, Flora and Frieda consented that she should be permitted to retain the automobile, and that the division of the property into thirds should only apply to the proceeds of the insurance and the residue of the estate.
The committee also decided that the parties should go to an attorney, the Honorable Raymond Vogel of Jackson, for the preparation of a written agreement conforming to the committee's decision, and that Bruening, a member of the committee, should accompany them to see that the agreement was properly drawn. This course was followed, and an agreement was prepared by Vogel as of August 27, 1948, which Ella and Flora signed, providing that in consideration of their mutual promises, both of them should assign their respective interests in the residue of the estate to one Wagner, the executor of the will; that Ella, upon final settlement of the estate, should turn over to Wagner the proceeds of the insurance less certain stated deductions; and that Wagner should thereupon distribute the total sum so received in equal parts between Flora, Ella, and Frieda as Theodore's guardian and curatrix.
Not only was the committee concededly influenced by what was represented to them as being Dr. W. A. Schoen's opinion regarding the proper division of the property, but Ella was likewise influenced by it and relied upon it in agreeing to accept the committee's decision. She and Dr. Schoen had always been good friends, and she had no reason to doubt the veracity of Frieda and Flora, the latter of whom was a minister's wife. In fact, being hurt by what was supposed to be Dr. Schoen's attitude, she asked him about it the day after the agreement *280 was signed, and was advised by Dr. Schoen that he had never expressed any such opinion as had been related to the committee. She then reported what she had learned to the committee, who called upon Dr. Schoen a few days later and were themselves told by him that he had not made the statement attributed to him. In view of this turn of events the committee advised Ella that she need not go through with the agreement she had signed, and as a consequence she proceeded to disregard it and await whatever might be the further developments in the case.
Upon the execution of the settlement agreement Frieda discharged Frye as her attorney, but reemployed him at the time of final settlement of the estate on March 7, 1949. Suffice it to say that in making his final settlement, Wagner, the executor, took no account of the agreement, and undertook to settle the estate in accordance with the provisions of the will. Frieda thereupon filed exceptions to the final settlement, and these being overruled by the probate court, she appealed to the circuit court, which sustained Wagner's motion for judgment on the pleadings and dismissed the exceptions. From this judgment Frieda appealed to this court, where it was held, for reasons stated in the opinion, that the probate court was without jurisdiction to enforce the agreement, and that Frieda's only remedy would be by action originating in the circuit court. Schoen v. Wagner, Mo.App., 231 S.W.2d 269.
Without awaiting the decision of this court, Frieda, on August 24, 1949, instituted the present action in the circuit court in two counts against Ella as defendant. The first count was based upon the theory that the settlement agreement entered into between Flora and Ella was a contract for the benefit of Theodore, a third party, and was therefore enforceable in his behalf by Frieda as his guardian and curatrix. Judgment was prayed under such count for the sum of $1,136.17 with interest, which principal sum represented the aggregate that Ella had received and retained out of the deceased's estate and the proceeds of the insurance that would have gone to Theodore if the settlement agreement had been given effect. The second count upon the same facts and for the same recovery was drawn upon the theory of money had and received.
Upon the institution of such action Ella filed a motion to dismiss upon the ground that the petition failed to state a claim upon which relief could be granted, and when the court sustained such motion with prejudice, Frieda appealed to this court, where the judgment was reversed and the cause remanded for further proceedings according to law. Schoen v. Lange, Mo.App., 238 S. W.2d 902.
Following the receipt of our mandate in the lower court, Ella answered, setting up that the settlement agreement was void and of no legal effect for the reason that her execution of it had been the result of fraud and duress which had been practiced upon her.
Tried to the court without a jury, there was a finding and judgment in favor of Ella. Frieda thereupon filed her motion for a new trial, and the same being overruled, she gave notice of appeal, and by proper successive steps has caused the case to be transferred to this court for our review.
At the outset of the case Frieda raises a question regarding the credibility of the witnesses and the weight to be accorded to their testimony.
Actually there was but little dispute of any consequence except as to whether Dr. W. A. Schoen, prior to the hearing before the church committee, had told Flora and Frieda that all the property in controversy should be divided equally between Flora, Ella, and Theodore. Everyone concerned, including Flora and Frieda, admitted that when Dr. Schoen was consulted about the matter after the hearing, he denied having ever made the statement. The question of veracity consequently reduces itself into one between Flora and Frieda on the one hand and Dr. Schoen on the other. Dr. Schoen's testimony was given wholly by deposition as to which there is no question of due deference involved. Proffit v. Houseworth, 360 Mo. 947, 231 S.W.2d 612. However Flora and Frieda gave oral testimony which we must consider in the light of the statutory admonition that due regard *281 shall be had for the opportunity of the trial court to determine the credibility of the witnesses. Section 510.310(4), RSMo 1949, V.A.M.S. Not only did the trial court find for Ella, but the record shows that the entire church committee also believed Dr. Schoen in preference to Flora and Frieda. In this situation the weight of the evidence so strongly supports the finding of the court that we must resolve the controversy in favor of Dr. Schoen's version of the facts, and proceed on the assumption that he had never made the statement to which Flora and Frieda testified before the committee.
Frieda's evidence followed the allegations of her petition; and since we have already upheld the legal sufficiency of the petition, Schoen v. Lange, supra, the only question remaining is whether the decision might have gone for Ella upon either of her defenses of fraud and duress. Frieda challenges the sufficiency of the answer upon the plea of fraud, but none the less elects in her brief to submit the whole case upon the sufficiency of the evidence to warrant the judgment in Ella's favor.
The elements essential to constitute a case of fraud are the same whether the fraud is asserted as the basis of a cause of action or, as here, by way of defense. Such elements are that a representation was made with respect to a material matter which was false and so known to be by the party making the representation; that it was made with the intent to deceive the other party and induce him to act upon it; that the other party had the right to rely upon it, and did rely upon it in ignorance of its falsity; and that he suffered injury as a proximate consequence. Latta v. Robinson Erection Co., Mo.Sup., 248 S.W.2d 569.
Frieda's contentions on this appeal are that the statement before the committee regarding Dr. Schoen's purported opinion as to how the property should be divided was not material to the controversy; that there was no evidence that she and Flora intended that Ella or any one else should act in reliance upon their statement; that Ella had had no right to rely upon it; and
that in any event there was no resulting injury.
As for the question of materiality, a representation is material if it relates directly to the matter in controversy and is of such a nature that the ultimate result would not have followed if there had been no representation, or if the one who acted upon it had been aware of its falsity. Stoltzfus v. Howey, Mo.App., 54 S.W.2d 501. In this case the whole controversy was over the division of the property, which was the very matter concerning which Dr. Schoen had purportedly expressed the opinion that Flora and Frieda related to the committee. While it goes without saying that neither Ella nor the committee was in any sense bound by Dr. Schoen's viewpoint, the record nevertheless discloses that it was his viewpoint that prompted the committee to render its decision, and that played its part in persuading Ella to accept it. So long as the committee believed that it was Dr. Schoen's opinion that the property should be divided equally between Flora, Ella, and Theodore, they acted accordingly, and the moment they were apprised that he had expressed no such opinion, they reversed their decision. There is no doubt under the evidence that the representation in question met all the tests of materiality.
Nor are we impressed by the suggestion of the lack of any showing that Flora and Frieda had intended that Ella should act in reliance on their statement. It was their own idea that their controversy with Ella should be aired before the church committee, and why then did they make the statement if not to influence the committee and also to influence Ella in accepting the decision once she had submitted herself to the committee's jurisdiction? It is an idle thing for Frieda to urge that after she and Flora had made the statement which was most material as we have pointed out, they should not have expected that it would be acted on in the manner reasonably contemplated.
Furthermore the same is to be said upon the question of whether Ella had had the right to rely upon the statement. It was uttered as the truth, and Flora and Frieda *282 were undoubtedly in a position to have known Dr. Schoen's opinion. It was told to so solemn a body as a church committee brought into being at their own request. Why then should Ella have been expected to doubt the truth of what they said? Under all the circumstances it is not for them to complain because Ella relied upon the truth of the representation that they themselves had made. Selle v. Wrigley, 233 Mo.App. 43, 116 S.W.2d 217.
The fact of Ella's injury appears with equal conviction. The statement of what purported to be Dr. Schoen's viewpoint carried great weight with the committee, and it was only because of her assumption that the committee and Dr. Schoen "felt that way" that Ella expressed willingness to sign the agreement. There is ample basis for finding that except for the statement of Dr. Schoen's opinion, the instrument would never have been executed.
Furthermore the evidence indicates that the settlement agreement could as well be invalidated upon the ground of duress, which, as understood in the decisions of this state, comprehends any form of constraint or compulsion which is sufficient to overcome the will of a person of ordinary firmness and to induce him to comply with a demand to which he would not have yielded if he had been permitted to act of his own volition. White v. McCoy Land Co., 229 Mo.App. 1019, 87 S.W.2d 672.
Although duress is often regarded as a species of fraud, there is nevertheless a clear distinction to be drawn between the two. In the case of fraud the party defrauded acts willingly because of the false representation made to him, while in the case of duress he acts knowingly but unwillingly because of the compulsion exercised upon him. Coleman v. Crescent Insulated Wire & Cable Co., 350 Mo. 781, 168 S.W.2d 1060.
Ella was at all times a member of the church in good standing. It would be the natural assumption that she believed its doctrines, conformed to its practices, and recognized its authority. As we have repeatedly pointed out, the decision of the church committee was based almost entirely upon the representation made by Flora and Frieda; and when the committee determined that a written agreement should be prepared in accord with their decision, they informed Ella that she should sign it. In fact, a member of the committee actually accompanied the parties to the office of an attorney suggested by the committee to see that the agreement was prepared in the form the committee contemplated. Ella signed the agreement notwithstanding competent legal advice and even urging by counsel to the contrary, but with the explanation to counsel that "it was either a case of signing that agreement or being excommunicated from her church".
It may be granted that no member of the committee had gone so far as to threaten her with excommunication, but it was none the less her opinion that she would suffer that extremity, an opinion by no means without justification in view of the Biblical injunction that one refusing to accept a church's decision promulgated under such circumstances should be regarded "as a heathen man and a publican". Matthew, 18:17. In fact, Pastor Keisker specifically admitted that "there was a moral proposition involved" as to whether Ella should be obedient to the decision of the committee. Even though the committee was unquesionably acting from the purest of motives, its authority had been invoked at the instance of Ella's adversaries; and the evidence would support the conclusion that because of Ella's fear of the consequences of disobedience to church authority, the effect of the committee's action was to deprive her of the free exercise of her own volition and to cause her to abandon her actual conviction as to what her rights in the matter were.
It follows that the judgment rendered by the circuit court should be affirmed, and it is so ordered.
ANDERSON and ARONSON, JJ., concur.